UNITED STATES of America, Plaintiff,

v.

Limmie Lee KILLOUGH, et al, Defendants.

Civ. A. No. 85V–1154–N.

United States District Court, M.D. Alabama, N.D.

Jan. 3, 1986.

John C. Bell, U.S. Atty., Kenneth E. Vines, Asst. U.S. Atty., Montgomery, Ala., Robert L. Ashbaugh, Michael F. Hertz and William S. Liebman, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for the U.S.

Joseph T. Deep, pro se.

Lewis B. Hickman, Jr., Montgomery, Ala., for Williams.

Jack W. Sullivan, pro se.

J. Bernard Brannan, Jr., Montgomery, Ala., for Harrell, individually and d/b/a LRH Mobile Contractors.

George B. Azar, Azar, Campbell & Azar, Montgomery, Ala., for L.M. and L.R. Henry and J.R. Peters.

Ronald P. Slepian, M. Donald Davis, Jr., McDermott, Slepian, Windom & Reed, Mobile, Ala., for Fountain-Lowery Enterprises.

James Jerry Wood and S. Alec Spoon, Wood & Parnell, P.A., Montgomery, Ala., for William Donald Fountain and Hugh T. Fountain.

Edward Massey and Melissa Posey, Clay, Massey & Gale, Mobile, Ala., for Ronny Caswell Kirkland.

## ORDER

VARNER, District Judge.

This cause is now before the Court on motions to dismiss filed herein by Defendants William Donald Fountain and Hugh T. Fountain; Defendant Ronny Caswell Kirkland; Defendant James Harrell, Individually and d/b/a LRH Mobile Contractors, Inc.; Defendant Don Williams, individually and d/b/a Mar-Don-Pat, Inc.; Defendant Luther Manuel Henry, individually and d/b/a Henry Tree Surgery, Inc.; Defendant Louis Rodney Henry, individually and d/b/a LRH Mobile Contractors, Inc.; Defendant John R. Peters, individually and d/b/a J & J Trim Shop; and Defendant Jack W. Sullivan, individually and d/b/a Sullivan Service Company. (These defendants are sometimes hereinafter referred to as non-official Defendants).

In its complaint filed herein September 27, 1985, Plaintiff, the United States acting on behalf of the Federal Emergency Management Agency ("FEMA"), alleged that the non-official Defendants who provided services to the State of Alabama under the United States Hurricane Frederic Disaster Relief Effort had violated the False Claims Act, 31 U.S.C. §§ 3729–3731 and committed other violations of state law.[1] In particular, the United States has charged that these Defendants entered into a kick-back scheme with Defendants Limmie Lee Killough and Joseph Toofie Deep, Jr., who at the time period pertinent to the Complaint were the respective Director and Deputy Director of the Temporary Housing Program, an office set up by the Alabama Civil Defense Disaster Housing Office to handle disbursement of federal disaster funds. (Messrs. Killough and Deep are hereinafter sometimes referred to as the official Defendants). It is alleged that based on the solicitation of one or more official Defendants, and at times on the solicitation of Defendant Williams, the non-official Defendants submitted bids on projects to provide and set-up mobile homes for the Temporary Housing Program, and aforesaid bids were inflated to assure that the official Defendants would receive a kick-back.[2] As a result, the United States is seeking damages under the False Claims Act and under state law.

In the various motions to dismiss before the Court, each of the Defendants has claimed that the False Claims Act does not afford protection to the Plaintiffs. Recovery under the False Claims Act, they charge, is limited to those instances in which a person has defrauded the United States government, and in the case herein, Defendants have asserted that the alleged action served to defraud only the State of Alabama. Specifically, they note that the fraudulent claims, if any, were made against the Temporary Housing Program, which was an office of the State of Alabama, and they were made against that agency after the United States had agreed to provide relief to the State of Alabama and after FEMA had in fact allotted the funds to finance the Temporary Housing Program. Thus, they claim that the complaint fails to allege that the federal government has been harmed as a result of the alleged fraud.

Title 31, Section 3729 of the United States Code provides, in pertinent part:

[A] person ... is liable to the United States Government ... because of the act of that person ... if the person—(1) knowingly presents, or causes to be presented, to an officer or employee of the Government or a member of an armed force a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or ap-

---

1. Plaintiffs seek additional or alternative relief under the theories of fraud, unjust enrichment, and mistake of fact.

2. Plaintiffs have alleged that the bids of the non-official Defendants were inflated by approximately $1200 per mobile home.

proved; (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid. . . .

For purposes of this case, it is important to note that a person can be held liable under the False Claims Act if he either *presents* or *causes* a fraudulent claim to be made against a Government official. As the United States Supreme Court has observed, the requirements of the statute can be met even where a fraudulent claim is actually filed with a state agency that is dependent upon federal government funding. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544, 63 S.Ct. 379, 384, 87 L.Ed. 443 (1943). One of the arguments of the Defendants is that the Plaintiffs have failed in their pleadings to allege any link between the allegedly fraudulent claims made against the Temporary Housing Program and the United States. (See Motion to Dismiss of Defendant Kirkland, page 1; Letter Brief of Defendant Kirkland, p. 2). It is the opinion of the Court that the Plaintiff is not required to allege a direct link between the United States and the fraudulent claims. Plaintiff merely needs to allege that Defendants defrauded the Temporary Housing Program, an organization which was dependent on the federal government for funding. The Court finds that the Plaintiff has sufficiently set forth a cause of action under the False Claims Act.[3]

■ The critical factor in determining liability under the False Claims Act is whether a claim has been presented "upon or against the Government of the United States."[4] In other words, do the allegedly fraudulent claims cause an injury to the funds or property of the United States if the claims are indeed paid? *United States v. Azzarelli Construction Co.*, 647 F.2d 757, 759 (7th Cir.1981).

In *Azzarelli*, the Seventh Circuit held that because the United States Treasury was not injured when a fraudulent claim was made upon funds distributed by the United States to the State of Illinois pursuant to the Federal-Aid Highway Act, the United States could not assert a cause of action under the False Claims Act. The court noted that under the Federal-Aid Highway Act, Illinois was entitled to a fixed and determinate yearly contribution from the United States, and any fraudulent claim made against the Illinois fund may have affected how that fund was distributed but it could not have influenced the total contribution of the United States to Illinois. *Azzarelli*, supra at 761. In contrast, in the instant case, as the Court discusses below, the law provides for accountability and refund to the United States of unexpended funds.

Defendants seek to use the reasoning of *Azzarelli* to dismiss the case herein. According to the Defendants, the Treasury of the United States was not harmed because once the funds were transferred from FEMA to Alabama for use in the Hurricane Fredric Disaster Relief Effort, they lost their federal character and thus, any claim against the funds would pose no burden on the United States Treasury. They point out that that FEMA had advanced funds to the State of Alabama before any of the Defendants had presented bids on the mobile home projects. Pursuant to the Feder-

3. In alleging that defendants "caused" the presentation of false claims to the federal government, the Plaintiff has set forth with specificity the legal relationship between FEMA, the Temporary Housing Program and the Defendants and the means by which the fraudulent claims could have harmed the United States government. Compare *United States ex rel. Simmons v. Smith*, CV 85–0698–H, S.D.Ala (Aug. 14, 1985), attached to Defendant Kirkland's letter brief.

4. In 1982, Title 31, United States Code, which includes the False Claims Act, was enacted. Act of September 13, 1982, Money and Finance,

Codification, Public Law No. 97–258, § 1, 96 Stat. 877. Prior to the codification, the False Claims Act, 31 U.S.C. § 231, punished any person who presented a false claim "upon or against the [federal] Government." In the 1982 codification, the quoted language was omitted as mere surplus. H.R.Rep. No. 97–651, 97th Cong., 2d Sess. 143, *reprinted in* 1982 U.S.Code Cong. & Ad.News, 1895, 2037. As the legislative history makes clear, Title 31 was codified without making any substantive changes in existing law. 128 Cong.Rec. H 9528, *reprinted in* 1982 U.S.Code Cong. & Ad.News, 4301–02.

al-State Disaster Assistance Agreement, FEMA agreed to advance funds to the State of Alabama in order to finance the Temporary Housing Program and the State agreed to execute a Temporary Housing Program in accordance with federal law and regulations.[5] The checks issued by the United States Treasury were forwarded from the Alabama Department of Civil Defense to the Alabama Department of Finance for deposit into a separate account for receipt and distribution of the federal funds.[6] The account served as the sole source of payments to persons who rendered services in connection with the mobile home set-up contracts. Specifically, contractors providing such services submitted written invoices specifying the services rendered on their set-up contracts to accounting personnel in the Mobile office of the Alabama Department of Civil Defense, which after approving said invoices, forwarded them to the Headquarters of the Alabama Department of Civil Defense in Montgomery, Alabama. Upon approval of the Director of the Alabama Department of Civil Defense, all of the documents, including the invoices, vouchers, and purchase requisition forms, were sent to the State Finance Department, which after final approval issued state warrants (checks) against the federal funds in the account to the ·Civil Defense Disaster Housing Office in Mobile for distribution to the contractors.[7]

There is no doubt that throughout this process the State of Alabama played a significant role in managing the funds, assuring their accountability, and finally in distributing them to the contractors. For instance, as Defendant Kirkland has observed, employees of the Alabama Civil Defense Department handled the alleged fraudulent claims of the Defendants, state officials controlled and administered the account, and the State Treasury, after approval of claims by the Alabama Department of Finance and the Alabama Civil Defense, released the funds for distribution. (Letter Brief of Defendant Kirkland, p. 2). Furthermore, the Agreement itself stated that the State of Alabama was responsible for maintaining and administering the funds. (See Agreement, paragraphs 5, 7 and 11–13).

On the other hand, the Agreement does assign to the federal government a significant role in the administration of the disaster program. As the Plaintiff has noted, the oversight authority of the federal government was extensive, giving the United States the power to approve project applications before the State distributed funds to the contractors, to withhold funding if the State breaches an applicable federal statute, regulation or the Agreement itself, and to audit records. (See letter brief of Plaintiff, p. 3). Moreover, the State was required to comply with federal provisions relating to debarment and suspension of contractors and it was required to maintain a program of nondiscrimination in accordance with federal laws. (See letter brief of Plaintiff, p. 3).

Furthermore, the Agreement itself characterized the funds as "federal" funds. (See Agreement, paragraphs 3, 9, 14). Indeed, in describing the purpose of the separate account the Acting Director of the Alabama Department of Civil Defense, Joe B. Hedrick, stated in his affidavit that the state account "was established to account for receipt and distribution of federal funds." (Affidavit of Joe B. Hedrick, p. 3, attached to Defendant Kirkland's letter brief). He also observed that the state

---

**5.** See paragraph 11 of the Agreement. Officials of Alabama's Civil Defense Disaster Housing Office forwarded to FEMA certain documents which were required for obtaining federal funds. Based on the information in these documents, FEMA ordered the United States Treasury to issue checks to the State in connection with the Temporary Housing Program. See Affidavit of Joe B. Hedrick, p. 3, attached to Defendant Kirkland's letter brief.

**6.** See Affidavit of Joe B. Hedrick, supra note 5, at p. 3.

**7.** In this final stage, the Civil Defense personnel also recorded the issuance of the warrant numbers into the Department's ledger on the account.

warrants issued to compensate the contractors were "issued against federal funds deposited into fund account number ..." Thus, not only did the Agreement classify the money as federal assistance but the top State official responsible for supervising the relief effort considered it to be federal money.[8]

Finally, of controlling importance is that the State of Alabama had a duty to return to the federal government any of the funds advanced to the State which were in excess of actual expenditures. That is, FEMA was entitled to receive from the State any advanced funds of the Temporary Housing Program which exceeded approved expenditures. (Agreement, paragraphs 1, 3(G)]. Unlike *Azzarelli*, where the State of Illinois was not compelled to refund excess funds, in the instant case, Alabama was required to refund any excess amount and to the extent that the State did not make a refund or the refund was reduced because of fraudulent claims made against the fund, the United States Treasury was impaired. In other words, the allegedly fraudulent claims of the Defendants could have either reduced or eliminated entirely the size of the refund to which the United States was entitled and thus imposed a burden on the United States government.

█ In light of the fact that, as a result of the allegedly fraudulent claims of the Defendants, the United States would have been injured and the fact that the Agreement between both parties stated that the funds were federal assistance and provided the United States with an important role in the disbursement of the funds, it is the opinion of the Court that the case herein is distinguishable from *Azzarelli* and that the motions to dismiss on the ground that the Plaintiff is not entitled to relief under the False Claims Act are due to be denied.

Some non-official Defendants, William Donald Fountain, Hugh T. Fountain, James Harrell, Don Williams, Luther Manuel Henry, individually and d/b/a Henry Tree Surgery, Inc., Louis Rodney Henry, individually and d/b/a LRH Mobile Contractors, Inc., and John R. Peters, individually and d/b/a J & J Trim Shop further contend that the United States has waived any right to bring this civil suit against said Defendants. In particular, they assert that in previous criminal actions the United States represented to the court that these Defendants were "extorted" and should not be required to pay restitution as a condition of their probation. According to the Defendants, such representation bars the United States from making a claim for damages under the False Claims Act or from filing any other suit for damages.

█ In their motion to dismiss, Defendants William Donald Fountain and Hugh T. Fountain stated that the Presentence Report of Defendant William Donald Fountain contains an admission by the United States that said Defendants are not required to pay any restitution. The Court has read the Presentence Report and is of the opinion that it does not make reference to the fact that these Defendants are not required to pay any restitution. [The Victim and Witness Protection Act, 18 U.S.C. § 3579, was not in effect.] It is further the opinion of the Court that even if Defendants can bring forth evidence to show that the United States stated that they were not required to pay restitution as a condition of probation,[9] and if such a representation constitutes an admission, this Court may still hear the action under the False Claims Act and under the civil laws of Alabama. Such an admission would have been binding in the criminal proceeding but it does not waive the right of the United States to

---

8. See also Affidavit of Sam B. Slone, III, successor to Mr. Hedrick, attached to Plaintiff's Notice of Filing (describing the money as "federal" funds).

9. According to Defendants Harrell, Luther Henry, Louis Henry and Peters, the United States refused to offer or require restitution. On the other hand, the United States attorneys have stated in affidavits that when they entered into plea agreements with Defendants, they did not promise not to bring civil action. (Affidavits, U.S. Attorney John C. Bell and Assistant U.S. Attorneys D. Broward Segrest and Charles L. Truncale).

seek damages in a later civil suit. *Matter of Raiford*, 695 F.2d 521, 523 (11th Cir. 1983).

 In addition, Defendant Williams has charged that the doctrine of collateral estoppel bars the United States from seeking recovery in the case herein. According to Defendant Williams, all causes of action involving the recovery of sums paid by the Civil Defense Department to Defendant Williams should have been raised in a prior suit, CV–80–500406, which was brought by the State of Alabama in the Circuit Court of Mobile County and dismissed with prejudice on September 26, 1984. Under the doctrine of collateral estoppel, a party is foreclosed from relitigating matters that have once been litigated and decided. C. Wright, *Federal Courts* 680 (1983). From the papers that Defendant Williams has filed with the Court, the Complaint and the Stipulation for Dismissal, it is impossible to determine what issues were litigated and decided in the action in the Circuit Court of Mobile County. Accordingly, it is the opinion of the Court that the doctrine of collateral estoppel is not applicable to the case herein. Additionally, the United States was not a party to that proceeding and could therefore not be bound thereby.

A number of the Defendants have also alleged that venue is improper in the instant case. According to Defendants William Donald Fountain and Hugh T. Fountain, venue is improper because they are life-long residents of Brewton, Alabama, which is located in the Southern Division of the Southern District of Alabama. Defendants Luther Manuel Henry, Louis Rodney Henry, and John Peters, as well, contend that venue is improper because they are residents and citizens of the State of Louisiana and at all times material hereto have been residents of, citizens of, and resided in the State of Louisiana.

 Under the False Claims Act venue clause: "Trial is in the judicial district within whose jurisdictional limits the person charged with a violation is found or the violation occurs." 31 U.S.C. § 3730(b)(1). It is the opinion of the Court that the

Plaintiff has alleged that the conspiracy violations and substantive violations took place in Montgomery, Alabama, where the false claim was presented to the Temporary Housing Program, and Montgomery is in the Northern Division of the Middle District of Alabama.

Accordingly, the motions to dismiss should be, and they hereby are, denied.